IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE CORNEJO,<br><br>    Petitioner,<br><br>vs.<br><br>CHRISTIAN PFEIFFER, Warden,<br><br>    Respondent. | No. 2:18-cv-00572-JKS<br><br>MEMORANDUM DECISION |

  Jesse Cornejo, a state prisoner represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Cornejo is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Kern Valley State Prison. Respondent has answered, and Cornejo has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

  On June 18, 2012, Cornejo, along with co-defendants Adam Cornejo and Isaac Vasquez, was charged with the murder of Deandre Ellison (Count 1), four counts of attempted murder (Counts 2-5), and discharging a firearm at an inhabited dwelling (Count 6).[1] Jesse was also charged with vehicle evasion of a police officer (Count 7). The information further alleged that each of the defendants committed Counts 1-6 for the benefit of, or at the direction of, a criminal street gang, as well as various other firearm enhancement allegations. The defendants pled not guilty to the charges, denied all allegations, and proceeded to a jury trial on July 16, 2012. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Jesse and the evidence presented at trial:

---

  [1] Because Jesse and Adam Cornejo share the same last name, this Court will, like the California Court of Appeal, refer to the defendants by their first names.

On the afternoon of January 19, 2011, Ellison left his home to go to the store. He drove his wife's Ford Taurus and brought along three other men, including [Latrele] Neal, who sat in the back of the car directly behind Ellison. On the way to the store, Ellison picked up another man, who was walking to Ellison's house, and then continued on to the store. Ellison, a former gang member, had a .40–caliber handgun in the car's center console. According to his wife, he bought the gun for protection. Having recently testified against another gang member in exchange for being released from jail, Ellison had received threats and was concerned about retaliation for being a "snitch." Neal was aware of the threats. He was also aware Ellison had a gun in the center console.

When Ellison and his companions returned from the store, they turned onto Ellison's street and noticed two vehicles approaching from the opposite direction. The first vehicle was a small car. The second vehicle was a Ford Explorer containing the defendants in this case. In order to pull into his driveway, which was on the left side of the street, Ellison turned between the two vehicles. Around this time, Neal noticed the occupants of the Explorer were giving them "hard looks" and said: "[W]ho is them muggin' us?" Before Ellison was able to put the car in park, Neal opened his door and started to step out to "figure out who was in them cars." As he did so, the Explorer stopped in front of Ellison's house and the front and backseat passengers, Adam and Isaac, opened fire with semi-automatic handguns.

Neal managed to "jump back in the car" before the first shots were fired. Multiple bullets struck the Taurus, shattering the rear window. When someone in the car said, "shoot back," Neal grabbed Ellison's handgun from the center console, fired one round through the "busted out" back window, and then got out of the car and continued firing at the Explorer until he "couldn't shoot no more." Neal fired at least six rounds. However, it does not appear any of Neal's shots struck the Explorer. Shots fired by Adam and Isaac were far more accurate. Combined, they fired at least 14 rounds, hitting both the Taurus and Ellison's home multiple times. One bullet struck Ellison in the upper back as he leaned forward in the driver's seat, traveled through his neck and head, and lodged in his brain. Death from this gunshot wound came within a matter of minutes.

After Adam and Isaac finished firing upon Ellison and his companions, the Explorer drove away. The Taurus's remaining passengers got out of the car. Neal "took off running" with Ellison's gun because he was afraid of being arrested for being a felon in possession of a firearm. Ellison's wife, Jettiemarie Boyd, who witnessed the shooting from outside her neighbor's home, ran to her husband. During the shooting, the Taurus had continued forward into the garage door. The tires were still spinning when Boyd reached the car. She put the car in park, removed the keys from the ignition, and tended to her husband. Boyd's mother and various neighbors also came out to check on Ellison, who was "slumped over the steering wheel" with "blood . . . coming out of his neck, running down his chest." He died before law enforcement and medical personnel arrived on the scene.

A description of the Explorer and the shooters was given to police at the scene and relayed over the radio to nearby patrol cars. The vehicle was located a short time later, not far from the crime scene. When a traffic stop was initiated, Jesse led officers on

a high-speed chase, reaching speeds of 85 miles per hour, before crashing the Explorer in an intersection. Defendants then attempted to flee on foot; each was taken into custody. During the chase, two handguns were thrown from the Explorer. Police recovered a 10–millimeter handgun along the chase route. Eight 10–millimeter casings found at the scene appeared to have been fired by this gun. A magazine for a nine–millimeter handgun and several unfired nine–millimeter rounds were also recovered along the chase route. The gun associated with the magazine and bullets was not recovered. However, Isaac admitted to police that a nine–millimeter handgun was also thrown from the vehicle and two nine–millimeter casings found in the Explorer appeared to have been fired by the same gun that fired six such casings found at the scene of the crime. Gunshot residue tests also corroborated the fact that Adam and Isaac were the shooters, while Jesse drove the Explorer.

Finally, the prosecution provided testimony from an expert on criminal street gangs, Detective John Sample, who testified Jesse, Adam, and Isaac were each active members of the Norteño street gang, and a hypothetical shooting based on the facts of this case would have been committed in association with or for the benefit of the gang.

*People v. Cornejo*, 207 Cal. Rptr. 3d 366, 374-74 (Cal. Ct. App. 2016).

At the conclusion of trial, the jury found each defendant not guilty of first-degree murder in Count 1, but guilty of second-degree murder. The jury also found each defendant guilty of all other counts and found true every allegation but one. The jury could not unanimously agree on the allegation that Jesse was armed with a firearm during the commission of Counts 1 through 5. The court sentenced Adam and Isaac each to imprisonment terms of 129 years and 4 months. The court imposed the same sentenced on Jesse plus an additional 8 months on the evading conviction.

Through counsel, Jesse appealed his judgment, arguing that: 1) the court violated his right to due process by excluding evidence of Ellison's Facebook page, which he argued was critical to support his claim that the shooting was committed in self-defense; 2) the trial court abused its discretion when it excluded the evidence; 3) trial counsel was ineffective for failing to press the trial court for a ruling on the Facebook post's admissibility to self-defense; 4) police experts were erroneously permitted to opine on an ultimate issue thus impermissibly invading

the province of the jury; and 5) the abstract of judgment should be corrected to reflect that the victim restitution order was a joint and several obligation. Jesse also joined in the claims raised by Adam and Isaac, which included a claim that the evidence was insufficient to establish the "criminal street gang" requirement of the gang enhancements because there was no evidence that the Sacramento Nortenos are part of the larger Norteno organization. Respondent conceded that the abstracts of judgment should be modified to reflect the victim restitution order, but otherwise opposed the appeal.

Following oral argument, the California Supreme Court decided *People v. Prunty*, 355 P.3d 480, 483 (Cal. 2015), holding that the prosecution is required "to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang." In that case, the Supreme Court determined that the prosecution had failed to introduce specific evidence showing that certain subsets of the Norteno gang identified with the larger Norteno group, or that the Norteno subsets shared a connection with each other, or any other Norteno-identified subset, such that one subset's activities could be imputed to another subset. *Id.* at 484. In considering Jesse's case on appeal, the Court of Appeal requested supplemental briefing on *Prunty's* impact on his case.

The Court of Appeal unanimously concluded that *Prunty* required reversal of the gang enhancement findings as to all defendants and also modified the restitution order. *Cornejo*, 207 Cal. Rptr. 3d at 372-73. The appellate court rejected all other claims. *Id.* at 373. The appellate court subsequently modified its opinion to reflect its reasons for denying Isaac's third petition for rehearing. Jesse petitioned the California Supreme Court for review of his unsuccessful claims, which was summarily denied on December 19, 2016.

Through counsel, Jesse submitted a petition for writ of habeas corpus to the Sacramento County Superior Court. In that petition, Jesse alleged that, in light of the reversal of the gang enhancements, the admission of evidence offered to support those enhancements violated his federal due process rights. The superior court denied the petition in a reasoned, unpublished opinion issued on February 5, 2018, concluding that the issue was already raised and rejected on appeal and that the admitted gang evidence did not prejudicially affect the resolution of the substantive offenses.

Cornejo then timely filed a counseled Petition for a Writ of Habeas Corpus to this Court on March 15, 2018. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A). Respondent moved to dismiss two of the claims for failure to exhaust in state court. Docket No. 12. This Court, through a previously-assigned judge, dismissed those claims as unexhausted and ordered Respondent to address the remaining three claims. Docket No. 20. The exhausted claims have now been fully briefed, and this case is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Cornejo argues that: 1) the trial court violated his due process rights by preventing Cornejo from introducing evidence of specific Facebook posts that allegedly indicated that Ellison had returned to gang activity; 2) trial counsel rendered ineffective assistance by failing to press the trial court for an evidentiary ruling on the Facebook evidence; and 3) the admission of expert testimony impermissibly invaded the province of the jury.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Cornejo has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

**Grounds 1, 2.**         *Evidentiary Error/Ineffective Assistance of Counsel*

Cornejo first argues that the trial court violated his right to due process by precluding him from introducing evidence in the form of Facebook posts that Cornejo avers show that Ellison had returned to gang activity. According to Cornejo, this evidence was critical to his defense because it would have supported the defense contention that "the people in Ellison's car had the same motivations to shoot first as the gang expert attributed to [defendants]." In considering this claim on direct appeal, the Court of Appeal laid out the following underlying facts:

> Jesse moved in limine to introduce a printout from Ellison's Facebook page that included a post made around two hours before the murder. The post stated: "GET MONEY TRUST NOT A SOUL MONEY AND MURDER I SWEAR IM BACK AT IT AGAIN WHO CAN I TRUST IN THIS WORLD? ? ? ? ? ? ? ? ? ? ? ? ? ? ? ? ? ? ? ? GET ACTIVE." The printout also included Ellison's profile picture, in which he was apparently making a gang sign with his hands.
> Jesse's trial counsel argued the post was relevant to show Ellison's state of mind at the time of the shooting, i.e., he and the other occupants of the Taurus "were expecting to get hit" and "were expecting trouble," which he argued was "very probative of who fired first." Counsel also argued the post was admissible despite the hearsay rule because it qualified as a statement of Ellison's then-existing state of mind and a statement against penal interest. Counsel further argued Boyd, who also had access to Ellison's Facebook account, could authenticate the post. Isaac's attorney joined in these arguments.
> In response, the prosecutor did not object to the profile picture being admitted, but argued defense counsel was attempting to "circumvent the hearsay rules and circumvent the foundational requirements" by seeking to admit the Facebook post. With respect to hearsay, the prosecutor did not actually make an argument. With respect to foundation, the prosecutor questioned whether counsel would be able to establish Ellison "did in fact, make that entry."
> After further argument from defense counsel, the trial court took the matter under submission.
> Trial began without a ruling on admissibility of the Facebook post. The following exchange occurred during Jesse's cross-examination of Neal:
>
> "Q Did you also say that [Ellison] don't even gang bang no more?
>
> "A Yes, I did say that. He did not gang bang anymore.

8

> "Q You don't know—you say you know that for a fact?
>
> "A I know that for a fact. [¶] He got married and he was a family—was a family man. He was changing his life. His grandma had just passed away. He had just got saved. [¶] He was—he was a totally different dude that I know from growin' up with. I know for a fact he did not gang bang anymore.
>
> "Q Did you ever go on his Facebook page?
>
> "A Yes, I did.
>
> "Q When was the last time you went on his Facebook page?
>
> "A Um, I been on there after he was killed. I been on there before he was killed."
>
> At this point, counsel again sought to admit the Facebook post, arguing the post was admissible under Evidence Code section 780 as evidence tending to disprove the truthfulness of Neal's testimony that Ellison was no longer "gang banging." The trial court ruled the post inadmissible under Evidence Code section 352, as requiring the jury to "embark on . . . something that's a bit of a side show, and that is the question of whether or not [Neal] believes [Ellison] was involved as a gang banger at the time." The trial court then instructed the jury to disregard Neal's "opinions as to whether or not [Ellison] was or was not involved actively as a member of a gang."

*Cornejo*, 207 Cal. Rptr. 3d 366, 381-82 (Cal. Ct. App. 2016).

Because trial counsel failed to press for a ruling as to whether the Facebook post was admissible as substantive evidence that members of Ellison's car fired first, and instead only raised the issue with respect to its admissibility to impeach Neal's testimony that Ellison was no longer a gang member, the trial court never ruled on the initial motion to admit the evidence to prove self-defense. The Court of Appeal thus concluded that the defendants forfeited that claim. *Id.* at 382-83.

Anticipating forfeiture, Cornejo raised on direct appeal, as he raises here, a corresponding claim that counsel was ineffective for failing to press for a ruling as to the

9

admissibility of the evidence to prove self-defense. The appellate court likewise rejected that claim, reasoning:

> Here, the Facebook post was minimally probative of defendants' claim of self-defense. Even assuming the post established in the jurors' minds that Ellison possessed the gun, not simply for protection, but also for gang purposes, i.e., confrontation, and Ellison deliberately cut off the Explorer while pulling into his driveway, neither fact would justify defendants' actions of opening fire on Ellison's car. The only purported fact that would justify such an assault is Neal's firing at the Explorer first, or at the very least, pointing Ellison's gun in defendants' direction, and thereby causing a reasonable belief in the need to employ deadly force in self-defense. But the Facebook post was made by Ellison, not Neal. There is no dispute Neal was the one who fired Ellison's gun. Indeed, Ellison was apparently hit before he could put the car in park. Ellison's post was therefore relevant on the issue of Neal's conduct only if Neal was aware of the post. In other words, Ellison's decision to return to gang life, by itself, does not tend to prove anything about Neal. However, Neal's belief Ellison was out of the gang life would tend to make it less likely that he would take it upon himself to use Ellison's gun to fire upon another vehicle in front of Ellison's house had occupants of that vehicle not fired first. Conversely, Neal's belief Ellison had returned to the gang life would tend to make his firing first in these circumstances more likely. But how much more likely? We conclude the answer is "not much." The evidence established Ellison had offered testimony against a rival gang member, had been threatened for having done so, and was pulling into his driveway when the shooting occurred. In these circumstances, regardless of whether Ellison had decided to return to the gang lifestyle, and regardless of whether Neal was aware of this decision, opening fire on an Explorer full of gang members in front of Ellison's house, and in a driveway with no means of escape when the occupants of the Explorer predictably returned fire, is so unlikely as to be implausible.
> Weighing against this low level of probative value is the reality that admission of the evidence would have required a significant consumption of time. The defense would have been required to establish what we have assumed in our analysis thus far, i.e., the post was in fact made by Ellison, the post indeed meant Ellison had returned to an active gang lifestyle, and Neal was aware of his return to this lifestyle. In light of the minimal probative value of the evidence, we cannot conclude the trial court would have abused its discretion by excluding the evidence under an Evidence Code section 352 analysis. Nor are we persuaded such a decision would have amounted to a deprivation of due process. While defendants are correct to point out Evidence Code section 352 "must bow to the due process right of a defendant to a fair trial and his [or her] right to present all relevant evidence of significant probative value to his [or her] defense[,] . . . the proffered evidence must have more than slight relevancy to the issues presented. [Citation.]" (*People v. Burrell–Hart* (1987) 192 Cal.App.3d 593, 599, 237 Cal.Rptr. 654; *People v. Reeder* (1978) 82 Cal.App.3d 543, 553, 147 Cal.Rptr. 275.) Here, as we have already explained, the Facebook post did not have significant probative value.

> In sum, because admission of the Facebook post would have necessitated an undue consumption of time and the post was not significantly probative of defendants' claim of self-defense, the trial court would not have abused its discretion or violated defendants' due process rights by excluding the evidence under Evidence Code section 352 had defendants' respective counsel pressed for a ruling on the matter. Thus, regardless of whether reasonable counsel would have pressed for such a ruling, our confidence in the outcome is not undermined.

*Cornejo*, 207 Cal. Rptr. 3d at 384-85.

It is well-settled that a criminal defendant has a constitutional right to present a defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). This right is not, however, without limitation. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see Crane,* 476 U.S. at 689-690; *Marshall v. Lonberger,* 459 U.S. 422, 438, n.6, (1983); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554, 564 (1967). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed

11

by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Under these guidelines, this Court cannot find that the exclusion of the Facebook posts was an abuse of discretion or unreasonable or contrary to federal law. Here, Cornejo had an opportunity to extensively cross-examine the prosecution witnesses about Ellison's past gang history and argue that Ellison had re-entered gang life. Cornejo argues that he should have been able to introduce additional extrinsic evidence in support of that argument. But the trial court properly determined that such evidence was not sufficiently relevant in this case. The proffered evidence, although relevant, had limited probative value. The trial court acted well within its discretion and within the bounds of the Confrontation Clause in determining that the limited probative value of the evidence was outweighed by the undue consumption of time that the presentation of such evidence would require as well as the danger of confusion to the jury. *See United States v. Scheffer*, 523 U.S. 303, 314 (1998) (noting that "collateral litigation prolongs criminal trials and threatens to distract the jury from its central function of determining guilt or innocence"). The trial court had legitimate concerns that proving up that Neal was aware that

12

Ellison had returned to gang life based on the Facebook posts would have resulted in a "minitrial" that would have unduly complicated the matter.

In short, excluding the proffered evidence here did not violate the Confrontation Clause or Cornejo's right to present a defense, nor was it contrary to any clearly established Supreme Court authority. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *cf. Guasch v. Cates*, No. C 10-5628, 2011 WL 2471029, at *11 (N.D. Cal. June 22, 2011) ("To have allowed a trial within a trial, that is, a trial of a witness's unrelated and as-yet unproven credit-card wrong within petitioner's own trial for trying to kill his wife would have been unwise. Defense efforts like this are routinely and rightly rejected without doing any damage to the Sixth Amendment."). Accordingly, Cornejo cannot show that his constitutional rights were violated by the exclusion, and for the same reasons, he fails to show that counsel was ineffective for failing to press the trial court for a ruling on the evidence's admissibility to prove self-defense. *See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996) (defense counsel's failure to raise a meritless argument or to take a futile action does not constitute ineffective assistance of counsel). Cornejo is not entitled to relief on either of these claims.

**Ground 3.** *Improper Expert Witness Testimony*

Finally, Cornejo contends that it was prejudicial error to allow expert opinion testimony that the defendants probably fired first because Ellison would not have wanted to "attract trouble" to his home. Cornejo avers that the admission of gang expert testimony impermissibly invaded the constitutional province of the jury and was an improper opinion that Neal was credible. The Court of Appeal considered and rejected this claim on direct appeal as follows:

**A.**
*Additional Background*

Detective Jason Kirtlan interviewed Neal in the presence of Neal's attorney, who had secured an immunity agreement for Neal prior to the interview. During his cross-examination of Detective Kirtlan, Jesse's trial counsel asked: "Now, when [Neal] came to talk to you, isn't it true that the first thing you said to him is, I know you're the victim?" The detective answered: "Something to that effect, yes." Counsel then asked: "Wouldn't it have been better to wait until you had heard what he had to say before you accepted his innocence?" The detective responded: "As I discussed earlier, there was overwhelming evidence in this case, as I've outlined, as to why I felt he was the victim and fired back in self-defense, as shared with the D.A.'s office, who agreed, and in this case gave him a letter of immunity."

During the prosecution's redirect examination, the prosecutor asked Detective Kirtlan: "Is there anything other than what you've already stated, which is the placement of the casings and the evidence around the scene, the statements from [Boyd] and other witnesses and the overall ballistics evidence in the case, including the shot into [a neighboring] house, that causes you to take the position that, in fact, [Neal] was being truth[ful]—that [Neal] did fire back second?" The detective answered: "Yes, there is." Then, after various objections were overruled, he explained: "[Ellison] was pulling into his driveway. He was in his neighborhood. He is not going to attract, nor would the occupants of his vehicle, in my belief, attract trouble to their home. [¶] The [Explorer] was out of the area. They're south area occupants up in the north area in a vehicle with weapons. [Ellison] was pulling into his driveway. [¶] If they were—if [Neal] were to have shot, the vehicle gets away, now they know where to come back to retaliate. [¶] It doesn't make sense to me. And given the totality of the rest of the evidence, that led me to my determination that the Taurus was fired on." Isaac's trial counsel then objected that the answer was an "[i]mproper opinion," which was overruled.

During Detective Sample's expert testimony, the prosecutor asked: "Assume that you have a gang member with several other people in his car. This gang member is feeling vulnerable. He has got a gun in his car. He's been threatened, he's been labeled a snitch. And he comes down the street and he sees other people coming towards him who are muggin' him, they don't—he doesn't know them, the people in his car don't know them, but they know that they are giving hard looks to him. [¶] Would it be consistent with your knowledge of gang members for those people feeling vulnerable to turn into a dead end and leave themselves open to attack?" Jesse's trial counsel objected that the answer was "speculative," which was overruled. The detective then answered: "No, it did not—it would not seem a likely response for somebody who's that alert to a possible threat."

### B.
### *Analysis*

Defendants argue the testimony of both detectives amounted to improper expert opinion for three reasons: (1) "the subject matter was not beyond the common experience of the average juror"; (2) "the opinion was essentially a question of whether the experts thought that Neal and [Boyd] were telling the truth when they testified that the [defendants] fired first"; and (3) because "the whole case boiled down to whether the jury

14

determined that Neal fired first or they fired first," the testimony amounted to "their view of how the case should be decided."  In response, the Attorney General draws a distinction between the two witnesses.  With respect to Detective Kirtlan, the Attorney General argues the challenged testimony "was not admitted as his opinion on whether Neal in fact acted in self defense," but rather "was properly admitted to rebut the implied bias raised by the defense under Evidence Code section 780, subdivision (f)," i.e., the detective concluded Neal fired in self-defense before speaking to him because of a prior working relationship with Ellison and Boyd because Ellison had cooperated in a previous case against a fellow gang member.  With respect to Detective Sample, the Attorney General argues the challenged testimony was a proper expert opinion.

**1. *Detective Kirtlan's Testimony was Properly Admitted***

"In determining the credibility of a witness, the jury may consider, among other things, '[t]he existence or nonexistence of a bias, interest, or other motive' for giving the testimony.  (Evid. Code, § 780, subd. (f).)" (*People v. Price* (1991) 1 Cal.4th 324, 422, 3 Cal.Rptr.2d 106, 821 P.2d 610.)  "Evidence showing a witness's bias or prejudice or which goes to his [or her] credibility, veracity or motive may be elicited during cross-examination." (*People v. Howard* (1988) 44 Cal.3d 375, 428, 243 Cal.Rptr. 842, 749 P.2d 279.)  Here, Jesse's trial counsel properly sought to elicit such evidence during his cross-examination of Detective Kirtlan by asking whether he was "frequently in contact" with Ellison and Boyd during his investigation of the previous case in which Ellison provided testimony against another gang member, which the detective admitted, and whether this working relationship made Detective Kirtlan "a little more emphatic" about "find[ing] the people that [he] believed were responsible," which the detective denied.  Counsel then asked Detective Kirtlan about his interview with Neal, specifically, whether he accepted the fact Neal was an innocent victim before he even "heard what he had to say."  The purpose for these questions, and the order in which they were asked, is unmistakable.  Counsel was seeking to establish that the detective did not consider the possibility Neal could have started the gunfight by firing on the Explorer because of his bias in favor of Ellison, one of his "snitches."

In these circumstances, it was proper for the prosecution to then rehabilitate the detective by eliciting the reason he believed Neal did not fire first before he had spoken to the man.  In other words, the challenged testimony was offered to show the detective's belief Neal fired in self-defense was based on reason, as opposed to mere bias, as the defense questioning suggested.  (*See, e.g.*, *People v. Nichols* (1970) 3 Cal.3d 150, 157, 89 Cal.Rptr. 721, 474 P.2d 673 [prosecution properly offered evidence of the reasonable basis for witness's testimony to rebut inference of bias raised by the defense on cross-examination].)

**2. *Detective Sample's Testimony was Properly Admitted***

Expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)  "The subject matter of the culture and habits of criminal street gangs ... meets this criterion." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617, 59

15

> Cal.Rptr.2d 356, 927 P.2d 713, *disapproved on another point in People v. Sanchez, supra*, 63 Cal.4th 665, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Here, Detective Sample testified, based on his special knowledge, training, education, and experience working as a gang detective, that a gang member who is feeling vulnerable because he has been threatened and labeled a snitch would not be likely to turn into a dead end and leave himself open to attack. Defendants argue this specific opinion was not sufficiently beyond common experience to be helpful to the jury because "[n]o sensible person, regardless of their gang status, would knowingly place themselves in a trap if they thought the[y] were under threat." We disagree. While no sensible person would pull into his own driveway and start a gunfight with no means of escape, whether a gang member would do so is not something the average juror would know. Nor was Detective Sample's testimony simply an opinion as to whether Neal and Boyd had testified truthfully concerning how the gunfight occurred, or as to how the jury should ultimately decide the case.
>
> The trial court did not abuse its discretion in allowing the challenged testimony of Detectives Kirtlan and Sample.

*Cornejo*, 207 Cal. Rptr. 3d at 379-81.

Under California law, expert testimony on criminal street gangs is admissible to prove the elements of the criminal street gang substantive offense and the gang enhancement. *See People v. Jasso*, 150 Cal. Rptr. 3d 464, 484 (Cal. Ct. App. 2012) (relying on expert testimony in part to support a conviction for the substantive offense); *see also People v. Hernandez*, 94 P.3d 1080, 1085 (Cal. 2004) ("In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs."). Cornejo nonetheless argues that Detectives Kirtlan's and Sample's testimony was improper because the opinion testimony improperly invaded the province of the jury on ultimate issues in the case. Cornejo argued on direct appeal that this testimony violated state law, but federal habeas relief is not available for errors of state law. *Estelle*, 502 U.S. at 67-68. He additionally argues in his Petition that the testimony deprived him of due process in violation of federal law. But under federal law, there is no support for "the general proposition that the Constitution is

16

violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). "[I]t is 'well-established . . . that expert testimony concerning an ultimate issue is not per se improper.' Although '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact.'" *Id*. (internal citations omitted); *see also Duvardo v. Giurbino*, 410 F. App'x 69, 70 (9th Cir. 2011) (noting that the Supreme Court "has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause"); *Briceno v. Scribner*, 555 F.3d 1069, 1077-78 (9th Cir. 2009), *overruled on other grounds as recognized in Emery v. Clark*, 643 F.3d 1210, 1215 (9th Cir. 2011). Indeed, the Ninth Circuit has recently reiterated that "because 'there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue . . . the admission of the opinion testimony of [a gang expert] cannot be said to be contrary to, or an unreasonable application of, Supreme Court precedent.'" *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) (quoting *Briceno*, 555 F.3d at 1077-78). Cornejo claims that the detectives' testimony was offered merely to opine that Neal was credible, but the Court of Appeal's determination that the evidence was not "simply an opinion as to whether Neal and Boyd had testified truthfully concerning how the gunfight occurred," *Cornejo*, 207 Cal. Rptr. 3d at 381, was neither unreasonable nor contrary to federal law. Cornejo is thus not entitled to relief on any argument advance in support of this claim.

## V. CONCLUSION AND ORDER

Cornejo is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: May 9, 2019.

    /s/James K. Singleton, Jr.
    JAMES K. SINGLETON, JR.
    Senior United States District Judge